PARKS v EMPLOYMENT SECURITY COMMISSION

CITY OF SAGINAW v LINDQUIST

DOLCE v FORD MOTOR COMPANY

Docket Nos. 73010, 75474, 75964. Argued June 5, 1986 (Calendar Nos. 11-13). Decided December 26, 1986. Certiorari denied in *Parks* by the Supreme Court of the United States on May 18, 1987, 481 US —; 95 L Ed 2d 838 (1987).

Anne B. Parks was discharged by the Detroit Board of Education for refusing to pay an agency shop fee as required by a collective bargaining agreement between the board and the district teachers' union. Parks applied for, but was denied, unemployment compensation benefits by a hearing referee on the ground that she left work voluntarily without good cause attributable to the employer. The board of review affirmed. The Wayne Circuit Court, Thomas J. Brennan, J., affirmed the decisions of the referee and the board. The Court of Appeals, J. H. Gillis, P.J., and Gribbs and Gage, JJ., affirmed in a memorandum opinion (Docket No. 66385). The plaintiff appeals.

Nancy A. Lindquist was discharged by the City of Saginaw for failing to maintain her permanent bona fide residence within the corporate limits of the city as required by the city's administrative code. Lindquist applied for and received unemployment compensation benefits. On appeal, a hearing referee denied benefits on the ground that she was discharged for misconduct connected with her work because she failed to meet one of the requirements of the employer's rules. The board of review agreed that the residency requirement was violated, but concluded that it was not work-connected. The Saginaw Circuit Court, Fred J. Borchard, J., affirmed, finding that the claimant's action did not constitute disqualifying misconduct. The Court of Appeals, D. E. Holbrook, Jr., P.J., and Cynar and Gillespie, JJ., reversed, holding that the claimant had violated the residency requirement in that there was an intentional and substantial disregard of her obligation to her employer which could be considered misconduct (Docket No. 67479). The defendant appeals.

Dominick Dolce was mandatorily retired from the Ford Motor Company. He claimed and was found eligible for unemploy-

ment benefits. The board of review reversed, finding that mandatory retirement as required under a collective bargaining agreement constituted a voluntary leaving of employment. The Wayne Circuit Court, Joseph B. Sullivan, J., affirmed. The Court of Appeals, MACKENZIE, P.J., and WARSHAWSKY, J. (WAHLS, J., dissenting), affirmed in an unpublished opinion per curiam (Docket No. 68415). Sophia Dolce, personal representative of the estate of Dominick Dolce, appeals.

In opinions by Justice BRICKLEY, joined by Chief Justice WILLIAMS and Justice ARCHER, and by Justices CAVANAGH, BOYLE, and RILEY, the Supreme Court *held:*

In *Parks* and *Lindquist,* the claimants were disqualified from receiving benefits; in *Dolce,* the claimant was entitled to benefits.

Justice BRICKLEY, joined by Chief Justice WILLIAMS and Justice ARCHER, stated that a claimant is disqualified from receiving unemployment compensation benefits under § 29 of the Michigan Employment Security Act where the claimant leaves work voluntarily without good cause attributable to the employer or is discharged for work-connected misconduct.

1. Work-connected misconduct is conduct evincing such wilful or wanton disregard of an employer's interest as is found in deliberate violations or disregard of standards of behavior which the employer has the right to expect of employees. Such misconduct is not limited to acts occurring at the workplace and may extend to actions outside the workplace.

2. In *Parks,* the claimant's failure to pay agency shop fees after receiving notice from her employer showed a wilful disregard of the employer's interest. The claimant did not have a constitutional right not to pay the required fees, and any effect on her First Amendment interests was outweighed by the state's interest in not using its moneys to pay unemployment benefits to persons who are disqualified under the act.

3. In *Lindquist,* the failure of the claimant to comply with her employer's residency requirement constituted a wilful disregard of her employer's interest and thus was work-connected. She was well aware of the residency requirement as a condition of employment as evidenced by her attempt to sustain the appearance of residency within the city.

4. In *Dolce,* the claimant did not leave work voluntarily, but was forced to leave pursuant to mandatory retirement provisions of a collective bargaining agreement. The collective bargaining process is too remote from individual employees to serve as a basis for determining whether a leaving of work was voluntary. Unlike *Parks* and *Lindquist,* there was no wilful

disregard of a condition of employment. The act directs inquiry to whether a worker left work voluntarily and does not address agreements between employers and third parties. As long as an employee does not voluntarily retire and otherwise meets the eligibility requirements of § 28 of the act, the employee will not be disqualified from receiving unemployment benefits when forced to retire under the terms of a collective bargaining agreement.

Justice RILEY, while concurring in the result in *Dolce* and *Lindquist,* stated that in *Parks* neither of the benefit-disqualification provisions enumerated in § 29 of the Employment Security Act is applicable under the particular facts of the case, requiring reversal of the decision of the Court of Appeals. Under the act, a person may be disqualified for leaving work voluntarily without good cause attributable to the employer or where discharged for misconduct connected with the work or for intoxication at work. Application of either provision requires a careful evaluation of the claimant's conduct within the factual circumstances of the case. Parks' justifiable actions were based on a meritorious claim against her employer and did not constitute misconduct under § 29(1)(b) or a voluntary leaving without good cause attributable to her employer under § 29(1)(a). Both the circuit court and the Court of Appeals erred in failing to consider the particular circumstances which led to her discharge.

Justice LEVIN concurred in the result reached by Justice RILEY.

Justice BOYLE, concurring in part and dissenting in part, stated that in these cases it is inappropriate to engage in a strained construction of the requirement that disqualification on the basis of misconduct be work-connected. In *Parks* and *Lindquist,* the claimants left work voluntarily, in *Dolce,* the claimant's retirement was for reasons beyond his control.

Justice CAVANAGH, concurring in part and dissenting in part, stated that the claimants should be disqualified for benefits on the basis of voluntarily leaving work under § 29(1)(a).

*Parks* and *Lindquist,* affirmed.

*Dolce,* reversed.

139 Mich App 515; 362 NW2d 771 (1984) affirmed.

*Keller, Thoma, Schwarze, Schwarze, DuBay & Katz, P.C.* (by *David E. Kempner*), and National Right to Work Legal Defense Foundation, Inc. (by *John C. Scully*), for plaintiff Parks.

*Robert E. Helm,* Assistant City Attorney, for plaintiff City of Saginaw.

*Jordan Rossen* and *Richard W. McHugh* for plaintiff Dolce.

*Sachs, Nunn, Kates, Kadushin, O'Hare, Helveston & Waldman, P.C.* (by *Theodore Sachs* and *Mary Ellen Gurewitz*), for defendant Detroit Public Schools.

*Borrello, Thomas & Jensen, P.C.* (by *Peter C. Jensen*), for defendant Lindquist.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *David A. Voges,* Assistant Attorney General, for defendant Michigan Employment Security Commission.

BRICKLEY, J. In these three consolidated cases we are asked to consider under what circumstances the disqualifying provisions of § 29 of the Michigan Employment Security Act apply so as to disqualify a claimant from receiving unemployment benefits.

### PARKS

Appellant Anne B. Parks began working for the Detroit Board of Education in 1935. In 1969, the Detroit Federation of Teachers was recognized by the employer as the bargaining unit of the employees. Under the collective bargaining agreement reached between the employer and union, each covered employee was required to pay union membership dues or agency shop service fees. Also, the agreement required the employer, upon notification and request by the union, to notify the employee of termination within sixty days if the dues were not paid. The agreement required the em-

ployer to terminate an employee who did not pay the fees within the sixty-day period. Appellant Parks was one of the covered employees, and thus the contract under which she worked required her to pay a service fee. Due to personal beliefs, she objected to the paying of service fees. Along with other employees, she challenged the compulsory service fee in a lawsuit initiated in 1969. In *Abood v Detroit Bd of Ed*, 431 US 209, 239; 97 S Ct 1782; 52 L Ed 2d 261 (1977), reh den 433 US 915 (1977), the United States Supreme Court held that it is constitutionally permissible to require employees to pay fees for the support of a union's activities in the areas of collective bargaining, contract administration, and grievance adjustment.[1]

After the *Abood* opinion was issued, appellant

---

[1] Without further comment, plaintiff, in the facts statement of her brief, states that she was willing to pay the collective bargaining share of the agency fees if they were separated from that portion of dues related to political and other activities not constitutionally extractable under *Abood*. The intended implication of this statement is unclear. However, we note that the propriety of plaintiff's discharge is not at issue in this case.

*Abood* was remanded by the United States Supreme Court for the purpose of giving the parties an opportunity to pursue a procedure for extrapolating the constitutionally permissible portion of their dues. Parks was dismissed from that action on remand for lack of standing when she refused to adhere to the procedures for collection of agency fees. She did not appeal from that dismissal. It may be that plaintiff's argument as to her discharge for failure to pay agency fees escaped Court of Appeals review in *Detroit Bd of Ed v Parks*, 98 Mich App 22; 296 NW2d 815 (1980) (see plaintiff's application for rehearing), but it was without question not raised before this Court in that case. For a history of those proceedings, see *Detroit Bd of Ed v Parks*, 417 Mich 268, 270, n 1; 335 NW2d 641 (1983).

Similarly, during oral argument in the instant case, plaintiff's counsel explicitly noted that Dr. Parks was not trying to relitigate *Abood* or challenge her discharge. He further admitted that the agency fee is constitutional and that plaintiff's argument was not meant to suggest that the discharge was unlawful. Parks' argument, instead, was directed solely at the issue addressed in this opinion.

Since plaintiff did not before this Court pursue the constitutional status of her discharge after her dismissal from *Abood* and is not contesting it now, we, for purposes of the disposition of this case, assume no constitutional infirmity in her discharge.

did not pay the service fee or any portion thereof to the union. Pursuant to the collective bargaining agreement, the union notified the employer that the fees had not been paid. The employer asked appellant to pay the fee, and, when it was not paid, the union requested that the employer issue a sixty-day termination notice. In 1978, the employer notified appellant that her employment would be terminated on March 11, 1978, unless the fees were paid before then. When the fees were not paid, appellant was discharged on that date.

This Court upheld the validity of the discharge. *Detroit Bd of Ed v Parks,* 417 Mich 268; 335 NW2d 641 (1983). Appellant then filed a claim for unemployment benefits. The MESC initial determination was that appellant was not disqualified for benefits due to misconduct. The employer sought redetermination on the ground that claimant voluntarily left her job, but the MESC claims examiner affirmed the original determination, again finding no disqualification for misconduct. The employer then appealed to the referee who reversed and held that

> claimant's separation from her employment was a result of an action instituted by herself and is therefore a voluntary leaving without good cause attributable to the employer.

The referee further found that the disqualification provision of § 29(1)(b) (misconduct) was inapplicable. This decision was affirmed by the board of review. The dissenting board member believed that appellant did not leave her work voluntarily because she was terminated. He also believed appellant was not disqualified for misconduct. In the opinion of the dissenting member, appellant's refusal to pay agency service fees was, at most, a

good-faith error in judgment or discretion which does not amount to misconduct under the act.

The circuit court affirmed, agreeing that there was a voluntary leaving because "claimant's loss of prerequisites for continued employment (i.e., the payment of the agency shop fees) was not the result of a *negligent* act of omission, but rather the product of a *voluntary choice* with knowledge of the consequences." (Emphasis in the original.) The court thus concluded that the board's findings were supported by competent, material, and substantial evidence. The Court of Appeals, in a brief memorandum opinion, also affirmed on this basis. We granted claimant's application for leave to appeal. 423 Mich 854 (1985).

### *LINDQUIST*

Appellant Nancy A. Lindquist was hired by the City of Saginaw on August 23, 1971. On February 5, 1981, she was discharged from her employment by the city because she failed to maintain her permanent bona fide residence within the corporate limits of the City of Saginaw in accord with Chapter 3, § 115 of the Saginaw Administrative Code. Section 115 of the code provides:

> Each city employee shall maintain a permanent and bona fide residence within the corporate limits of the City. Any employee who fails to comply with the provisions of this section shall be deemed to have abandoned such employment and shall thereafter receive no salary or wages from the City.

After being terminated, appellant filed an application for unemployment benefits with the MESC on February 10, 1981. The commission initially determined that she was ineligible for benefits, but

upon redetermination ruled that she was not disqualified for misconduct because

> [t]he rule regarding residency bears no relation to the work to be performed and therefore any violation of the rule cannot be considered misconduct in connection with the work. . . . It is determined that claimant's discharge was for reasons other than misconduct in connection with the work . . . .

The city then appealed to the referee who made the following findings of fact:

> In January 1981 the employer was notified that the claimant was not complying with Section 115 of the Code. An investigation was conducted. The claimant indicated to the employer that she resided at 3122 Fulton Street, Saginaw, Michigan. The investigation disclosed that on October 21, [1977] the claimant moved from 3717 Huntly Road, Saginaw, Michigan to 3122 Fulton Street, Saginaw, Michigan. Both of these addresses are located within the corporate limits of the City of Saginaw. The investigation also disclosed that the property on Fulton Street in 1977 was owned by a Mr. Carl Brown; that in 1978 the property on Fulton Street was owned by Gladys Brown, and in 1979-1980 the home on Fulton Street was vacant. Later, on the death of Gladys Brown, the property on Fulton Street became the property of Barry Brown. In early February 1981 the property on Fulton Street was placed for sale.
>
> Four years prior to the time of separation claimant and her husband sold their home. Her husband and children moved to 2657 Birch Point, Lupton, Michigan and claimant began to reside with her aunt at 3122 Fulton Street. The claimant traveled each weekend to Lupton, Michigan and remained with her family. The claimant also went to Lupton during the week in the event of her children's illness or to engage in school or other activities.

The claimant's aunt died in 1979 and claimant continued to reside at the Fulton Street address to prevent the building from being vandalized. Claimant paid no rent to Mr. Barry Brown, the executor of the estate of Gladys Brown. The claimant received mail at the Fulton Street address. The claimant voted in the City of Saginaw, and on her drivers license she lists the Fulton Street address.

The referee found that appellant was not a resident of Saginaw:

> In this case, the claimant was not a bona fide resident because her address on Fulton Street was not her true home. Her true home was in Lupton, Michigan. It was at her home in Lupton, Michigan that her children and husband lived and where she intended to reside. She only lived in Saginaw for the purpose of being close to work. In addition, her address on Fulton Street was not her fixed home. It was her temporary home while she was away from her true home in Lupton. Her intent was always to return to Lupton. Nor was her home in Saginaw a permanent home. She never intended to remain at that place indefinitely into the future until a new residence was obtained because she already had a residence in Lupton. If the adage is true that "A person's home is where their heart is," claimant's home was in Lupton because her heart was always with her husband and children. Also the intent of the claimant was to reside on Fulton Street only in an attempt to meet the requirements of the city charter. The claimant never intended the Fulton Street address to be her permanent address. It was a place to stay while she was away from Lupton. Thus, it was not a bona fide residence.

The referee concluded that appellant was discharged for misconduct connected with her work because she "failed to meet one of the requirements of the employer's rules . . . ."

Upon the claimant's appeal, the board of review agreed that the residency requirement was violated, but concluded that even if this constituted misconduct, it was not work-connected. The "violation of the requirement did not occur on the job, nor did it occur because of problems in connection with work or work performance."

The dissenting member of the board of review believed that the misconduct was work-connected. He opined that the majority interpreted the "work connected" requirement too narrowly when it held that the misconduct must relate to work performance or an on the job violation. Appellant also could have been disqualified for voluntarily leaving her employment in the view of the dissenting member. He reasoned that there was not a constructive voluntary leaving because claimant was aware of the city's administrative code provision which deemed a violation of the residency requirement to be an abandonment of employment.

The circuit court agreed with the board of review that appellant's actions did not constitute disqualifying misconduct within the meaning of the MESA. Summary judgment was entered in appellant's favor.

The Court of Appeals reversed. 139 Mich App 515; 362 NW2d 771 (1984). The panel affirmed the finding that appellant violated the residency requirement because it was supported by competent, material, and substantial evidence, and further concluded that

> there was an intentional and substantial disregard of [appellant's] obligation to her employer which could be considered misconduct. [139 Mich App 522.]

The Court of Appeals also determined that

claimant was ineligible for unemployment benefits because she voluntarily left work without good cause attributable to the employer.

> Loss of qualification for employment because of residency is in the control of the employee and falls within the meaning of "voluntary leaving without good cause attributable to the employer or employing unit" and is not "constructive voluntary leaving." [139 Mich App 523.]

This Court granted claimant's application for leave to appeal on December 11, 1985. 424 Mich 856 (1985).

### DOLCE

Appellant[2] Dominick Dolce worked full time for Ford Motor Company from April 20, 1964, through November 30, 1977. Appellant was a member of the United Auto Workers Union and thus worked under the terms contained in the collective bargaining agreement between Ford and the UAW. The agreement provided:

> An employee automatically shall be retired under the Plan on the earlier of:
> (i) the first day of the month following his 65th birthday.
>
> *   *   *
>
> Notwithstanding the foregoing provisions the Company may allow an employee to delay his retirement beyond age 65 if the employee is on a skilled classification for which the Company determines that there are [sic] an insufficient number of available, qualified persons to meet its needs ade-

---

[2] The plaintiff-appellant, Sophia Dolce, was substituted as plaintiff-appellant as the personal representative for her deceased husband on motion granted by this Court. For convenience, appellant will mean either the deceased or his personal representative.

quately, but not beyond the earlier age of 68 or the time the Company determines that it can otherwise adequately meet its needs on his classification.

Appellant was allowed to work three years beyond the ordinary retirement age of sixty-five, but on November 30, 1977, he was forced to leave work due to his age. The referee found that appellant was able "to perform suitable full-time work of a character which he is qualified to perform by past experience or training, and of a character generally similar to the work" performed for Ford. MCL 421.28(1)(c); MSA 17.530(1)(c).

Appellant thereafter filed an application with the MESC, seeking unemployment insurance benefits. The hearing referee found that appellant was eligible for benefits and not otherwise disqualified. The board of review reversed and, relying on *Applegate v Palladium Publishing Co,* 95 Mich App 299; 290 NW2d 128 (1980), lv den 409 Mich 904 (1980), held that "[m]andatory retirement provisions under a collective bargaining agreement constitute a voluntary leaving of employment . . . ." The Wayne Circuit Court affirmed the decision of the board of review, believing itself bound to that conclusion by *Applegate, supra.* In a divided opinion, the Court of Appeals affirmed. Two members of the panel agreed with the conclusion reached in *Applegate* and also noted that the Legislature had amended § 29(1)(a) subsequent to that case (1982 PA 535), but did not change the result of *Applegate.* They viewed this as legislative acquiescence in the interpretation reached in *Applegate.* The dissenting member of the panel wrote that the rationale used in *Applegate* was rejected by this Court in *MESC v Vulcan Forging Co,* 375 Mich 374; 134 NW2d 749 (1965).

Accordingly, he believed that *Applegate* was wrongly decided.

After the Court of Appeals denied rehearing, we granted the claimant's application for leave to appeal. 424 Mich 856 (1985).

### ANALYSIS

In 1936, the Michigan Employment Security Act became law. Section 2 of that act expresses the legislative policy sought to be achieved by the act.

> The legislature acting in the exercise of the police power of the state declares that the public policy of the state is as follows: Economic insecurity due to unemployment is a serious menace to the health, morals, and welfare of the people of this state. Involuntary unemployment is a subject of general interest and concern which requires action by the legislature to prevent its spread and to lighten its burden which so often falls with crushing force upon the unemployed worker and his family, to the detriment of the welfare of the people of this state. Social security requires protection against this hazard of our economic life. Employers should be encouraged to provide stable employment. The systematic accumulation of funds during periods of employment to provide benefits for periods of unemployment by the setting aside of unemployment reserves *to be used for the benefit of persons unemployed through no fault of their own,* thus maintaining purchasing power and limiting the serious social consequences of relief assistance, is for the public good, and the general welfare of the people of this state. [MCL 421.2; MSA 17.502. Emphasis added.]

Section 29 of the act establishes instances in which those seeking unemployment benefits are disqualified.

(1) An individual shall be disqualified for benefits in the following cases in which the individual:

(a) Left work voluntarily without good cause attributable to the employer or employing unit. However, if the individual has an established benefit year in effect and, during that benefit year, has left unsuitable work within [60] days after the beginning of that work, such leaving shall not be disqualifying.

(b) Was discharged for misconduct connected with the individual's work, or for intoxication while at work unless the discharge was subsequently reduced to a disciplinary layoff or suspension.

The appellant-claimant in *Lindquist* claims that she is not disqualified under either provision. We agree with the Court of Appeals that her violation of the residency requirement constituted misconduct within the meaning of the statute and thus do not decide whether there was a voluntary leaving.[3]

In *Carter v MESC*, 364 Mich 538, 541; 111 NW2d 817 (1961), this Court adopted the following definition of misconduct:

"The term 'misconduct' . . . is limited to conduct evincing such wilful or wanton disregard of an employer's interest as is found in deliberate violations or disregard of standards of behavior which the employer has the right to expect of his employee, or in carelessness or negligence of such degree or recurrence as to manifest equal culpability, wrongful intent or evil design, or to show an intentional and substantial disregard of the em-

[3] We do note, however, that the characterization of the Saginaw City Charter that the failure to maintain a residency in the city is an abandonment of employment would not be relevant to resolving the question whether there was a voluntary leaving. A discharge for misconduct or other reason cannot be turned into a voluntary leaving merely by labeling it so.

ployer's interest or of the employee's duties and obligations to his employer. On the other hand mere inefficiency, unsatisfactory conduct, failure in good performance as the result of inability or incapacity, inadvertencies or ordinary negligence in isolated instances, or good-faith errors in judgment or discretion are not to be deemed 'misconduct' within the meaning of the statute."

We believe that appellant's failure to comply with the residency requirement constitutes misconduct within this definition.[4] The appellant's actions amounted to conduct showing a wilful disregard of her employer's interest. The employer has a strong interest in seeing that its rules are uniformly applied and followed. The employer had the right to expect that its employees would abide by the residency requirement.[5] Appellant had a duty and obligation to her employer to maintain her residency within the city limits. She was well-aware of this condition of her employment as evidenced by her attempt to sustain the appearance of residency in the city. That the employer chose to make this requirement a condition of continued employment tends to show the importance of the rule to the employer's interest. See *Rodgers v Commonwealth*, 40 Pa Commw 552; 397 A2d 1286 (1979).

Furthermore, we would hold that the misconduct in this case was work-connected. We do not believe that the phrase "work connected" should

[4] Appellant further maintains that there was no violation of the residency requirement. The referee found as a matter of fact that appellant never intended to make the Fulton Street house her permanent home and that her intent was to return to Lupton to be with her husband and children. This conclusion is supported by competent, material, and substantial evidence on the whole record and is not contrary to law. It is thus sustained. Const 1963, art 6, § 28; MCL 24.306(1)(d), 423.216; MSA 3.560(206)(1)(d), 17.455(16).

[5] The wisdom or validity of the residency requirement is not before us, but we do note that it is not unreasonable that a municipal government would limit the benefits of employment to those who reside within its borders and pay its taxes.

be so narrowly construed so as to apply to only misconduct occurring at the workplace. This construction would allow employees to engage in acts inimical to their employer's legitimate interest outside the workplace and yet receive unemployment benefits when they are justifiably discharged. There are some occupations and professions in which the employer is entitled to expect certain standards of behavior both in and out of the workplace. Actions outside the workplace may, at times, be more detrimental than those that occur on the job. The residency requirement here was part of the city's administrative code and applied to all employees who worked for the city. We would find that the violation of this provision was serious enough to constitute misconduct as that term has been interpreted and also conclude that the violation was sufficiently work-connected to justify a denial of unemployment benefits.[6]

In *Parks,* we also believe that the employee's actions constituted misconduct and do not decide whether they would amount to a voluntary leav-

---

[6] *Reed v Employment Security Comm,* 364 Mich 395, 396; 110 NW2d 907 (1961), is cited *post,* p 247, to support the view that plaintiff's refusal to abide by the residency ordinance was, even if misconduct, not "work related," as § 29(1)(b) requires. In *Reed,* the employer established a rule "that an employee would be discharged from employment if a second writ of garnishment of his wages were served upon the company. Within a period of 9 months, 4 garnishments of plaintiff's wages were served on it. In consequence, he was discharged."

This Court held that, while plaintiff's failure to pay his debts may have been wrong, it "was in no wise connected with his work, even though the consequences might in some manner affect his employer." 364 Mich 397.

In this instant case, the "wrong" is not directed at third parties, but directly and solely at the interest of the municipal employer, which is supported by the taxes of its constituents and wishes to provide employment only to its constituents. While a failure to discharge third-party debts cannot be construed as "work-related," the purposeful refusal to adhere to an ordinance in which the municipality, as an employer, has the sole direct interest cannot, in our view, be seen as anything but "work-related."

ing. Appellant's failure to pay the fees was based on her dispute with the union. No matter what the merits of this dispute are, her failure to pay any fee whatsoever was clearly a wilful disregard of the employer's interest. The employer would have been in breach of its contract had it not terminated appellant. The employer had the right to expect that the fees would be paid. When they were not, the union exercised its contract rights and requested that the employer either collect the appellant's fees or terminate her. Appellant's continuing refusal to pay the fees even after receiving the termination notice put the employer in a position which would have compelled it to be in breach of its contract with the union had it not terminated her. This is sufficient to constitute work-connected misconduct.

We are not persuaded that appellant's "good faith" dispute concerning the union's ability to collect the fees is enough to make her action not misconduct. Appellant's misconduct was intentional in the sense that she intentionally did not pay the fees. Thus, even if she had a good-faith belief that the fees need not have been paid, her intentional act of not paying them after receiving notice from her employer showed a wilful disregard of the employer's interest.

We would also conclude that, contrary to appellant's assertion, there is no constitutional violation in the denial of unemployment benefits under the circumstances of the case. In *Abood, supra,* the Court held that the constitution was not violated by the forced collection of fees by the union as long as the fees were used in the course of its duty as the exclusive collective bargaining representative. The Court also held, however, that there was an "impact" on First Amendment interests in the union shop arrangement

[t]o compel employees financially to support their collective-bargaining representative has an *impact* upon their First Amendment interests. An employee may very well have ideological objections to a wide variety of activities undertaken by the union in its role as exclusive representative. His moral or religious views about the desirability of abortion may not square with the union's policy in negotiating a medical benefits plan. One individual might disagree with a union policy of negotiating limits on the right to strike, believing that to be the road to serfdom for the working class, while another might have economic or political objections to unionism itself. An employee might object to the union's wage policy because it violates guidelines designed to limit inflation, or might object to the union's seeking a clause in the collective-bargaining agreement proscribing racial discrimination. The examples could be multiplied. To be required to help finance the union as a collective-bargaining agent *might well be thought, therefore, to interfere in some way* with an employee's freedom to associate for the advancement of ideas, or to refrain from doing so, as he sees fit. [431 US 222. Emphasis added.]

This "impact" on constitutional rights was "constitutionally justified" by the "important contribution of the union shop to the system of labor relations established by Congress." *Id.*

We would hold that in this case the minimal effect on appellant's First Amendment interests does not make the denial of unemployment benefits unconstitutional. We stress that appellant did not under *Abood* have a constitutional *right* not to pay the collective bargaining agency fees. The Supreme Court has only held that the forced payment of such fees may create a First Amendment "impact" or an "interference" with the freedom to associate. Thus, the requirement to pay agency fees does not, in our view, directly confront

a constitutional right as was the case in *Thomas v
Review Bd of Indiana Employment Security Div*,
450 US 707; 101 S Ct 1425; 67 L Ed 2d 624 (1981),
where an employee who quit rather than violate
his religious convictions was found to have been
unconstitutionally denied unemployment benefits.

The state has an obvious interest in not using its
moneys to pay unemployment benefits to those
who are disqualified under the MESA. Also, the
state has an interest in protecting employers from
being required to pay a percentage of unemploy-
ment benefits to all those who object to complying
with the employers' policy.

The policy of the MESA embodied in § 2 and
disqualifying provisions in § 29 manifest the state's
interest in reserving unemployment benefits for
those who are unemployed due to forces beyond
their control. Also, the state's interest in sound
and balanced labor relations could be weakened if
large numbers of workers displeased with union
shop arrangements were able to have their period
of unemployment financed by the state and their
former employers. We would hold that any effect
on appellant's First Amendment interest is out-
weighed by the state's interest in upholding the
denial of benefits in this case.

In *Dolce*, the misconduct-disqualifying provision
of the statute is not relevant, and the only issue is
whether the appellant left work voluntarily within
the meaning of § 29(1)(a).

Other jurisdictions that have addressed this is-
sue on the basis of disqualifying language similar
to that in Michigan's statute have split. The lead-
ing case holding that there is no voluntary leaving
when an employee is mandatorily retired pursuant
to a collective bargaining agreement is *Campbell
Soup Co v Employment Security Bd of Review*, 13

NJ 431; 100 A2d 287 (1953). The majority of cases since *Campbell* have followed it when faced with the same facts and similar statutory language. *Reynolds Metals Co v Thorne,* 41 Ala App 331; 133 So 2d 709 (1961), cert den 272 Ala 709; 133 So 2d 713 (1966); *Employment Security Comm v Magma Copper Co,* 90 Ariz 104; 366 P2d 84 (1961); *Jenkins v Review Bd of Indiana Employment Security Div,* 138 Ind App 12; 211 NE2d 42 (1965); *Warner Co v Unemployment Compensation Bd of Review,* 396 Pa 545; 153 A2d 906 (1959); *Southwestern Bell Telephone Co v Employment Security Bd of Review,* 210 Kan 403; 502 P2d 645 (1972); *St Joe Paper Co v Gautreaux,* 180 So 2d 668 (Fla App, 1965); *Publishers Paper Co v Morgan,* 10 Or App 94; 498 P2d 798 (1972); *Duval Corp v Employment Security Comm,* 83 NM 447; 493 P2d 413 (1972). The leading case holding that there is a voluntary leaving under these circumstances is *Bergseth v Zinsmaster Baking Co,* 252 Minn 63; 89 NW2d 172 (1958). Cases following *Bergseth* include: *Kentucky Unemployment Ins Comm v Kroehler Mfg Co,* 352 SW2d 212 (Ky, 1961); *Lamont v Director of the Div of Employment Security,* 337 Mass 328; 149 NE2d 372 (1958); *Ivy v Dudley,* 6 Ohio St 2d 261; 217 NE2d 875 (1966); *McDonnell Douglas Corp v Labor Industrial Relations Comm,* 592 SW2d 295 (Mo App, 1979).

The *Campbell* opinion reasoned that the unemployment statute is remedial in nature and should be liberally construed. The court also noted that an understanding as to the duration of employment should not mean the employee's termination at the end of that period is voluntary. Employees are sometimes forced to accept jobs which their employers tell them at the time will engage their services for only a specific period. The voluntary acceptance of such work, knowing in advance its

fixed duration, does not transform the termination at the agreed time into a voluntary leaving.

In *Warner, supra,* the court reasoned that an employee should not lose a statutory right to which he would otherwise be entitled merely because of a collective bargaining agreement between the union and employer. The theory that the employee has voluntarily agreed to quit cannot govern the determination under the statute because the pressures of the collective bargaining process are so complex. Looking to the collective bargaining process, rather than to the termination, would require an inquiry in each case to determine the position of each side at the bargaining table and even then a clear cut answer would probably not appear.

The *Bergseth* court reasoned that the employee had voluntarily left employment because of the union's agreement with the employer. The employees elected to have a union be their representative with the employer and thus gave up their rights to deal individually with the employer. Any act by the bargaining agent is deemed to be a voluntary act of each member of the union which forecloses any subsequent claim by an employee that actions which are binding on him under the terms of the collective bargaining agreement are involuntary.

We have reviewed the decisions from other jurisdictions and conclude that the result reached by *Campbell* and the cases following it is more likely the result intended by the Legislature in the Michigan statutory scheme.[7] We do not believe that the drafters intended to deny benefits from persons

---

[7] MCL 421.27(f); MSA 17.529(f) deals with the payment of unemployment benefits to retired persons. Nothing in this section suggests an intent that the disqualifying provisions of § 29 are applicable to forced retirement situations. If the Legislature intends to have persons forced to retire disqualified under the voluntary leaving provision, its intent must be made more clear.

unemployed due to being mandatorily retired. We recognize that under Michigan law the union is the collective bargaining agent for all the employees and in many respects the employee is bound by and accountable for the actions of its bargaining agent. However, for purposes of determining voluntariness under the MESA, the collective bargaining process is too remote from the individual employees who come and go under it to allow those legislative presumptions under the state's scheme of labor law to transform a forced retirement into a voluntary leaving.

The statute disqualifies those who have left work voluntarily. Dolce did not leave work voluntarily, but was forced to leave. Unlike, Parks and Lindquist, who wilfully disregarded a condition of employment, Dolce was helpless to stave off the aging process and his eventual termination. The presence of a union agreement with the employer does not change the relationship between the employee and employer with respect to this statutory inquiry. The language of the statute directs the inquiry to whether the worker left voluntarily and does not address any agreements between the employer and third parties.

As long as an employee does not voluntarily retire and otherwise meets the eligibility requirements of § 28 of the MESA, he will not be disqualified from receiving unemployment benefits when forced to retire under the terms of a collective bargaining agreement.

The judgment of the Court of Appeals in *Dolce* should be reversed and the case remanded for proceedings consistent with this opinion.

The judgment of the Court of Appeals should be affirmed in *Parks* and *Lindquist.*

WILLIAMS, C.J., and ARCHER, J., concurred with BRICKLEY, J.

Riley, J. (*concurring in part and dissenting in part*). The common issue presented in these consolidated appeals concerns the construction and application of § 29(1)(a) of the Michigan Employment Security Act. Additionally, in *Lindquist,* the application of § 29(1)(b) is implicated, and in *Parks,* an independent constitutional question is raised.

I concur in the result of Justice Brickley's opinion in *Dolce* and *Lindquist.* I respectfully dissent in *Parks.*

I

The first two disqualification provisions enumerated in § 29 of the Employment Security Act provide:

(1) An individual shall be disqualified for benefits in the following cases in which the individual:

(a) Left work voluntarily without good cause attributable to the employer . . . .

(b) Was discharged for misconduct connected with the individual's work, or for intoxication while at work . . . . [MCL 421.29; MSA 17.531.]

While I disagree with Justice Brickley's application of § 29(1)(b) in *Lindquist,* I would concur in the decision to affirm upon the basis of the Court of Appeals application of § 29(1)(a).[1]

Justice Brickley's conclusion that an employee's failure to comply with an employment rule which may be viewed as a condition of employment or

[1] The Court of Appeals, reversing the decisions of the circuit court and the MESC Board of Review, found that Lindquist's actions "could be considered misconduct." The Court also held that Lindquist's failure to comply with the residency requirement constituted a "voluntary leaving without good cause attributable to the employer" within the meaning of § 29(1)(a). 139 Mich App 515, 522-523; 362 NW2d 771 (1984).

rule of selection (i.e., residency requirement or compulsory agency fee payments), without regard to the particular circumstances, constitutes "misconduct connected with the individual's work" within the meaning of § 29(1)(b), is problematic and requires an expansive construction of that disqualifying provision. That expansive construction effectively vitiates the inherent scienter element from the definition of "wilful misconduct" as defined in *Carter v MESC,* 364 Mich 538, 541; 111 NW2d 817 (1961), and by the courts of other jurisdictions construing similar disqualification provisions.[2] Moreover, Justice BRICKLEY's analysis substantially ignores the statutory requirement that such misconduct be "connected with [the individual's] work." See *Reed v Employment Security Comm,* 364 Mich 395, 396; 110 NW2d 907 (1961).

Every American jurisdiction has similar disqualification provisions within their employment security laws.[3] The courts of numerous jurisdictions have considered the application of those provisions in cases in which an employee has failed to comply with a nonwork-performance condition of employment or rule of selection, including the nonpayment of compulsory union dues and voluntary resignations because of the change of location of residency.[4] It is significant to note that those reported decisions have considered the applicability of the "voluntary leaving without good cause"

[2] See Packard, *Unemployment without fault: Disqualifications for unemployment insurance benefits,* 17 Vill L R 635 (1972); Kempfer, *Disqualifications for voluntary leaving and misconduct,* 55 Yale L J 147 (1945).

[3] See Kempfer, n 2.

[4] See Anno: *Termination of employment as a result of union action or pursuant to union contract as "voluntary" for purposes of unemployment compensation benefits,* 90 ALR2d 835, 851; Anno: *Eligibility for unemployment compensation as affected by voluntary resignation because of change of location of residence,* 21 ALR4th 317.

disqualification as opposed to the disqualification for "work-connected misconduct" in such cases.

In any event, the particular circumstances of each case must be considered in determining the applicability of either disqualifying provision. The application of § 29(1)(a) or (b) requires an inquiry entirely separate from whether the individual was "justifiably discharged."

In *Lindquist,* although the claimant did not resign because of the change of location of her residence, I would affirm the decision of the Court of Appeals that her failure to sufficiently comply with the residency requirement, which was a condition of her employment, constituted a "voluntar[y] [leaving] without good cause attributable to the employer," within the meaning of § 29(1)(a). While I agree that the referee's conclusions concerning the definition of "residency" and whether the claimant had failed to maintain a bona fide residence within the corporate limits of the City of Saginaw are supported by competent, material, and substantial evidence and is not contrary to law, I am not persuaded that the claimant's attempt to comply with her employer's residency requirement constituted wilful "misconduct connected with [her] work" within the meaning of § 29(1)(b). Rather than expansively construing § 29(1)(b) to include cases in which an employee "failed to meet one of the requirements of the employer's rules . . . ," without regard to whether the "violation of the requirement . . . occur[red] on the job, . . . [or] because of problems in connection with work or work performance,"[5] I would simply treat the claimant as if she had done that which was presumably required under the circumstances—resigned because of the relocation of her

[5] *Ante,* pp 232, 233.

permanent residence. In construing § 29(1)(a) as applicable in such cases, I would emphasize that, unlike some of the corollary provisions of other jurisdictions, § 29(1)(a) is applicable to individuals who leave work "voluntarily without good cause *attributable to the employer . . . .*" (Emphasis added.)[6]

II

The appellant-claimant in *Parks* was disqualified under § 29(1)(a). In reaching that conclusion, the referee, reversing the initial determination, expressly found that § 29(1)(b) (misconduct connected with the individual's work) was inapplicable. Parks' disqualification under § 29(1)(a) was affirmed by the MESC Board of Review, the trial court, and the Court of Appeals. Justice BRICKLEY does not review the application of § 29(1)(a), but, instead, concludes that Parks' actions constituted "misconduct connected with [her] work" within the meaning of § 29(1)(b).

I would note, initially, that the reported decisions from other jurisdictions considering the disqualification of individuals who were discharged for failing to pay union dues, even in the absence of any excuse whatsoever, like the referee, board of review, circuit court, and Court of Appeals in the present case, have consistently relied upon the disqualification for "voluntarily [leaving] without good cause."[7] No reported decision has found such actions to constitute "misconduct connected with

---

[6] Pursuant to the similar disqualifying provisions of some jurisdictions, "good cause" need not be "attributable to the employer." See Anno: 21 ALR4th 317. See also Packard, n 2 *supra,* 641.

[7] See Anno: 90 ALR2d 835. See also, e.g., *Nottelson v Wisconsin Dep't of Industry,* 94 Wis 2d 106; 287 NW2d 763 (1980), text accompanying n 12 and cases cited therein. Cf. *Barksdale v Director of Div of Employment Security,* 397 Mass 49; 489 NE2d 994 (1986).

the individual's work." Nevertheless, determining the application of either statutory disqualification *requires* considering the factual circumstances which resulted in the claimant's unemployment.

I find particularly troublesome the statement in Justice Brickley's opinion that "[n]o matter what the merits" of Parks' dispute with her employer were, her failure to pay the agency fees, in the amount demanded, prior to a judicial determination of the constitutionally permissible amount of those fees after remand by the United States Supreme Court in *Abood v Detroit Bd of Ed,* 431 US 209; 97 S Ct 1782; 52 L Ed 2d 261 (1977), constituted "work-connected misconduct." To suggest that the Legislature intended § 29(1)(b) to be so expansive as to disqualify an individual who is discharged from public employment in a case in which the employee properly asserted a "meritorious" claim that the First and Fourteenth Amendments protected the individual from submitting to the employer's demands is untenable.

The flaw in the analyses of my colleagues' opinions for affirmance stems from their failure to carefully consider the factual circumstances which led to Parks' discharge in order to evaluate whether her actions constituted "misconduct" or a "voluntar[y] [leaving] without good cause" within the statutory meaning of § 29(1)(a) or (b). I would emphasize that the application of either disqualifying provision *requires* a careful evaluation of the claimant's conduct within the factual circumstances presented, case by case. Considering the factual circumstances surrounding Parks' discharge, I would conclude that neither statutory disqualification is applicable. My disposition of this case, based upon a resolution of the statutory issues, would make it unnecessary to address the constitutional question presented.

An understanding of the issues presented in *Parks* requires a brief summary of the dispute which resulted in Parks' unemployment, including the United States Supreme Court decision in *Abood, supra,* and Parks' dismissal as a party plaintiff in that case on remand from the United States Supreme Court.

Pursuant to the agency shop agreement negotiated and incorporated into the collective bargaining agreement concluded in 1969 between the Detroit Federation of Teachers and the Detroit Board of Education, all teachers employed by the board were required either to join the union or to pay the union a service fee equal to dues required of union members as a continuing condition of employment.[8] Justice BRICKLEY treats the case at bar as if there could be no justifiable excuse for the nonpayment of the service fee in the amount requested, and that, regardless of an employee's claim that the amount requested exceeds that which is constitutionally permissible, the failure to forward such payments upon demand constitutes "work-connected misconduct." My colleagues, like the trial court and the Court of Appeals, treat this case as if the agency shop agreement required, without exception, that the claimant pay the fees, that it gave the union an absolute and unlimited right to require payment of the fees and to demand discharge of a nonpaying employee, and that the board had no alternative but to discharge the claimant. I am persuaded that my colleagues' view

[8] In 1973, the Legislature amended the public employment relations act to permit agency shop union security agreements. See MCL 423.210; MSA 17.455(10). In *Abood v Detroit Bd of Ed,* 60 Mich App 92, 98; 230 NW2d 322 (1975), the Court of Appeals held that the 1973 amendment could not be applied retroactively and, therefore, invalidated the agency shop provision in the contract entered into in 1969 between the Detroit Federation of Teachers and the Detroit Board of Education.

of the rights and obligations of the claimant, the union, and the board is erroneous.

In *Abood, supra,* in which Parks was one of the plaintiffs, the United States Supreme Court unanimously reversed the decision of the Michigan Court of Appeals which had affirmed the dismissal of the action commenced by Parks and other teachers challenging the constitutionality of the public sector agency shop and the extent to which nonunion members could be compelled to financially support noncollective bargaining union expenditures which they opposed.[9] The Court of Appeals had acknowledged that, because statutory authority permitted the union to expend dissenters' fees for purposes unrelated to collective bargaining, the agency shop arrangement "could violate" the plaintiffs' constitutional rights.[10] None-

[9] *Abood v Detroit Bd of Ed,* 431 US 209; 97 S Ct 1782; 52 L Ed 2d 261 (1977). Justices Brennan, White, Marshall, Rehnquist, and Stevens joined in Justice Stewart's opinion. Justices Rehnquist and Stevens also wrote separate concurring opinions, and Justice Powell wrote a concurring opinion in which Chief Justice Burger and Justice Blackmun joined.

[10] *Abood,* n 8 *supra,* 60 Mich App 99. The Court construed § 10 of the PERA, as amended, which permits employment to be conditioned upon the payment of a service fee equal in amount to dues required of union members, as not limited to the proportionate necessary costs of collective bargaining and the concomitant benefits received by nonunion employees. The Court further stated:

> The political activities of labor unions are well-recognized. It is reasonable to assume that at least a portion of every union's budget goes to activities that could be termed political, e.g., support of candidates sympathetic to the union cause and lobbying for the passage of bills in the Legislature. Since the amendment of MCL 423.210; MSA 17.455(10), does not limit the nonmember's contribution to his proportionate share of the costs of collective bargaining, it is clear that the amendment sanctions the use of nonunion members' fees for purposes other than collective bargaining.
>
> * * *
>
> Therefore, we conclude that the agency shop clause, as prospectively authorized by the amendment to MCL 423.210; MSA 17.455(10), could violate plaintiffs' First and Fourteenth Amendment rights. [*Id.,* 99-100.]

theless, the Court of Appeals had affirmed the trial court's dismissal of plaintiff's action for failure to state a claim upon which relief could be granted because the plaintiffs had not *specifically* objected to *particular* union expenditures and, therefore, no appropriate remedy was available.[11] It was this aspect of the Court's decision which was reversed in *Abood.*

The Supreme Court's decision in *Abood* has spawned a great deal of commentary.[12] While upholding the public sector agency shop against a broad First Amendment challenge, the Court held that a union's use of compelled service fees for purposes "not germane to its duties as collective bargaining representative" impermissibly abridges a dissenting nonunion employee's freedom to refrain from associating with ideas and beliefs which he opposes.[13] Thus, the Supreme Court upheld the enforcement of the agency shop agreement in

[11] *Id.*, 102.

[12] See, e.g., Sullivan, *Freedom of association and the public sector agency shop: Ball v Detroit, and* Abood v Detroit Board of Education, 85 Dick L R 21 (1980); Pulliam, *Union security clauses in public sector labor contracts and* Abood v Detroit Board of Education: *A dissent,* 31 Lab L J 539 (1980); *The Supreme Court, 1976 Term,* 91 Harv L R 70, 188-198 (1977); Note, *Constitutional limits on the use of contributions compelled under agency shop agreements,* 38 La L R 850 (1978); Comment, *Abood v Detroit Board of Education: Association as a First Amendment right—The protection of the nonmember employee in the context of public sector unionism,* 1977 Utah L R 487. See also *Developments in the law—Public employment,* 97 Harv L R 1611, 1728-1734 (1984); Schmedemann, *Of meetings and mailboxes: The First Amendment and exclusive representation in public sector labor relations,* 72 Va L R 91 (1986); Comment, *The use of public funds for legislative lobbying and electoral campaigning,* 37 Vand L R 433 (1984).

[13] The Court accepted the proposition that the agency shop itself impinges upon dissenting employees' First Amendment rights of free speech and association inasmuch as the employee is forced to support an association espousing demands and ideas with which he does not agree. The Court acknowledged that the activities of public unions directly "influence governmental policymaking" and "may be properly termed political." *Abood, supra,* 231. The Court upheld the public sector agency shop only to the extent that it was necessary to promote labor peace and stability, by permitting an exclusive bargain-

question only to the extent that amounts demanded from dissenting nonunion employees reflected their pro-rata share of the costs of collective bargaining, contract administration, and grievance adjustment.[14]

The *Abood* Court reversed the decision of the Michigan Court of Appeals regarding the burden of proof imposed upon dissenting nonunion members in such cases, referring to its decision in *Railway Clerks v Allen,* 373 US 113; 83 S Ct 1158; 10 L Ed 2d 235 (1963):

> [I]n holding that as a prerequisite to any relief each appellant must indicate to the Union the *specific* expenditures to which he objects, the Court of Appeals ignored the clear holding of *Allen.* As in *Allen,* the employees here indicated in their pleadings that they opposed ideological expenditures of *any* sort that are unrelated to collective bargaining. To require greater specificity would confront an individual employee with the dilemma of relinquishing either his right to withhold his support of ideological causes to which he objects or his freedom to maintain his own beliefs without public disclosure. It would also place on each employee the considerable burden of monitoring all of the numerous and shifting expenditures made by the Union that are unrelated to its duties as exclusive bargaining representative. [*Abood,* 241.]

Vacating the decision of the Court of Appeals as "unduly restrictive," *id.,* 240, the Court held that

ing representative, and avoiding the "free-rider" problem that would arise if the employees were not required to support the union financially, but still benefited from the union's collective bargaining activities. *Id.,* 224.

The Court held unanimously that nonunion employees could not, consistent with the First and Fourteenth Amendments, be compelled to contribute to the support of ideological causes which were not work-related and that the employees opposed. See *id.,* 232-237.

[14] *Id.,* 235.

the union must bear the burden of proving the amount of permissible expenditures. *Id.,* 237, 239. Although the Court found the statutory authority permitting agency shop union security agreements to be overbroad as authoritatively construed by the Michigan Court of Appeals, it did not strike down the statute. See *id.,* 232-237. But see Tribe, Constitutional Law, 589. Because no factual record had been established, the Court remanded the case for further proceedings, including the creation of an appropriate remedy. *Id.,* 242.

Contrary to the implication in Justice BRICK-LEY's opinion, and the representations of counsel,[15] the *Abood* Court did not hold that the plaintiffs could be compelled to forward the entire amount of the service fees to the union and to await a refund in an amount to be determined by the union.[16] Nor did the Court hold that plaintiffs,

---

[15] Counsel for appellee, Detroit Public Schools, has inaccurately represented the Supreme Court's decision in *Abood.* Counsel continues to assert that in *Abood,* the Court held that Parks had no "First Amendment right not to pay an agency service fee." During the circuit court proceedings, counsel argued, although she was subsequently corrected partially by cocounsel, that the *Abood* decision specifically disapproved the escrow remedy, and approved the pure rebate procedure. Wayne Circuit Court, Brennan, J., July 28, 1982, on appeal from the MESC Board of Review, pp 36, 47-49. Counsel continues to argue that the constitutional issues underlying the dispute which resulted in Parks' discharge were entirely settled "adversely to [Parks] in *Abood."* The specific holding in *Abood* vacating the Court of Appeals affirmance of the dismissal of Parks' claim and effectively reinstating that claim to proceed consistent with the Court's decision that the constitution requires imposing the burden of proof upon the union in such cases, has been completely ignored.

[16] Because of the procedural posture of the case—dismissal for failure to state a claim—the Court did not pass upon the merits of the case or the constitutional sufficiency of the possible remedies which it discussed. Mr. Justice Stevens, concurring, *Abood, supra,* 244, said:

> [T]he Court's opinion does not foreclose the argument that the union should not be permitted to.exact a service fee from nonmembers without first establishing a procedure which will avoid the risk that their funds will be used, even temporarily, to finance ideological activities unrelated to collective bargaining.

nonunion employees, could be required to exhaust internal union remedies prior to receiving a judicial determination of the permissible extent of the fees.[17] Although the *Abood* Court's holding was limited because of the procedural posture of the case, the Court expressly held that the action commenced by the plaintiffs in *Abood* could not, consistent with the First and Fourteenth Amendments, be dismissed for failure to state a claim, and that the union and the board, not the plaintiffs, were constitutionally required, in the event that the parties could not "voluntarily" resolve their dispute, to establish that the amount of the agency shop fees reflected the proportionate costs of permissible collective bargaining expenditures.

The following appears to have occurred upon remand from the United States Supreme Court. The union and the board demanded payment of all outstanding agency fees pursuant to an internal union procedure by which the union would determine what amounts, if any, were to be refunded. Parks did not object to paying her share of the union's costs of collective bargaining. She alleged, however, that the amounts demanded grossly exceeded her pro-rata share of those permissible costs, filing an extensive affidavit to support that

More recently, in *Ellis v Brotherhood of Ry Clerks*, 466 US 435, 443-444; 104 S Ct 1883; 80 L Ed 2d 428 (1984), the Court expressly rejected the "pure rebate approach" because "the union obtains an involuntary loan for purposes to which the employee objects," and alternatives, such as "interest-bearing escrow accounts" are "readily available alternatives." See Sullivan, n 12 *supra*, 39-41.

[17] See Sullivan, n 12 *supra*, 28-32. The *Abood* Court "merely suggested the desirability of an internal union remedy," and the possibility that the parties would "voluntarily" resolve their dispute. *Chicago Teachers Union v Hudson*, 475 US 292, —, n 19; 106 S Ct 1066; 89 L Ed 2d 232, 247, n 19 (1986) (citing *Abood, supra*, 240, and n 41). In *Chicago Teachers Union*, the Court held that a "reasonably prompt opportunity to challenge the amount of the fee before an impartial decision-maker" is constitutionally required, *id.*, 89 L Ed 2d 249, and, thus, that a dissenting nonunion employee "need not exhaust internal union hearing procedures . . . ." *Id.* (White, J., concurring).

allegation,[18] and moved the trial court, unsuccessfully, to allow depositing the entire amount of the fees demanded into a neutral escrow account pending the judicial determination of the appropriate costs. The union and the board moved to have Parks dismissed as a party plaintiff on grounds of lack of standing. After denying Parks' renewed motion to establish an escrow account, the Court dismissed Parks from the action for lack of standing to challenge the constitutional permissibility of the amount of the fee.[19] Immediately thereafter Parks was discharged.[20]

Parks contended that, pursuant to *Abood,* because the demanded service fee included disputed amounts, she was entitled to deposit the fees into an escrow account pending proof by the union of her proportionate share of the costs of collective bargaining, contract administration, and grievance

[18] Parks filed an affidavit in which she specifically objected to the use of the service fees for all political and ideological purposes unrelated to the union's duties as exclusive bargaining representative. She referenced numerous issues of an official union publication to support her allegation that the demanded fees included impermissible amounts, that she had not been provided with an accounting of her proportionate share of the union's costs of collective bargaining, and that the "authorization for deduction of full agency-shop service fees" which the union demanded she sign, contained the following language: " 'I hereby waive all right and claim for . . . monies paid in accordance with this authorization.' "

[19] See *Detroit Bd of Ed v Parks,* 98 Mich App 22, 46-48, n 24; 296 NW2d 815 (1980). The constitutionality of Parks' dismissal escaped judicial review. The Court of Appeals found that issue to be moot "because Mrs. Parks' case is before us now . . . ." *Id.,* 48. Parks' motion for reconsideration in which she asked the Court to reconsider, or at least explain, its disposition of her "constitutional" challenge to her discharge as somehow having become "moot" was denied.

[20] Parks appealed her discharge to the State Tenure Commission, which ruled in her favor. Her statutory challenge was rejected on appeal to the circuit court, and the Court of Appeals affirmed, holding that the teacher tenure act, MCL 38.71 *et seq.;* MSA 15.1971 *et seq.,* was inapplicable. *Detroit Bd of Ed v Parks,* n 19 *supra.* This Court affirmed the decision of the Court of Appeals. 417 Mich 268; 335 NW2d 641 (1983). Her constitutional challenge was not addressed by this Court.

adjustment. She argued that compelling the payment of amounts beyond her proportionate share of those costs would be violative of her First and Fourteenth Amendment rights of free speech and association because it would impermissibly impose a prior restraint upon the free exercise of those fundamental rights.

On the basis of my reading of *Abood,* I am persuaded that Parks' assertions were meritorious and, therefore, that a justifiable excuse for her actions was presented. My interpretation of *Abood* in this regard is consistent with the Court of Appeals decision in *Ball v Detroit,* 84 Mich App 383; 269 NW2d 607 (1978), and the decisions of courts in other jurisdictions.[21] Moreover, it is consistent with two recent decisions in which the Supreme Court has interpreted its own decision in *Abood.* See *Chicago Teachers Union v Hudson,* 475 US 292; 106 S Ct 1066; 89 L Ed 2d 232 (1986); *Ellis v Brotherhood of Railway Clerks,* 466 US 435; 104 S Ct 1883; 80 L Ed 2d 428 (1984).

In *Chicago Teachers Union, supra,* 89 L Ed 2d 244, the Court considered the procedural safeguards required by the First Amendment in light of its decision in *Abood, supra,* that nonunion employees have a "constitutional right to 'prevent the Union's spending a part of their required service fees to contribute to political candidates and to express political views unrelated to its duties as exclusive bargaining representative' "

---

[21] *Ball* involved similar challenges to an agency shop agreement entered into in 1970 by the City of Detroit and the American Federation of State, County, and Municipal Employees. The Court of Appeals postponed its decision in *Ball,* pending the Supreme Court's decision in *Abood.* See Sullivan, n 12 *supra,* for a discussion of *Ball* and *Abood.* Cf. *White Cloud Ed Ass'n v Bd of Ed,* 101 Mich App 309; 300 NW2d 551 (1980). See also *School Comm v Greenfield Ed Ass'n,* 385 Mass 70; 431 NE2d 180 (1982); *Beck v Communications Workers of America,* 468 F Supp 93 (D Md, 1973). See, generally, Anno: *Union security arrangements in state public employment,* 95 ALR3d 1102 (1979).

(quoting *Abood, supra,* 234). The Court held that "the constitutional requirements for the Union's collection of agency fees include an adequate explanation of the basis for the fee, a reasonably prompt opportunity to challenge the amount of the fee before an impartial decisionmaker, and an escrow for the amounts reasonably in dispute while such challenges are pending." *Id.,* 89 L Ed 2d 259.

The Court held, consistent with its earlier decision in *Ellis, supra,* that a "forced exaction followed by a rebate" is inadequate because it does not "avoid the risk that dissenters' funds may be used temporarily for an improper purpose." *Id.,* 89 L Ed 2d 246. Quoting *Abood, supra,* 244 (concurring opinion), the Court said: " '[T]he Union should not be permitted to exact a service fee from nonmembers without first establishing a procedure which will avoid the risk that their funds will be used, even temporarily, to finance ideological activities unrelated to collective bargaining.' " The Court emphasized its holding in *Abood* that, although the nonunion employee has the burden of raising an objection, "the union retains the burden of proof " concerning the constitutionally permissible amount of the required agency shop fees. *Chicago Teachers Union* (citing *Abood, supra,* 239-240, n 40). The Court addressed the union's burden of proof in this regard, furthermore, stating that the union is required to establish the amount of expenditures for permissible "collective bargaining and contract administration," and not simply to identify the amount impermissibly expended. *Id.,* 89 L Ed 2d 247.

The Court addressed the union's proposal that maintaining an escrow of one hundred percent of the contributions exacted from dissenting nonunion employees would eliminate any valid constitu-

tional objection to the procedure it had instituted.[22]
The Court rejected that proposal, stating that the
union's procedure would remain flawed in two
respects because it did not "provide an adequate
explanation for the advance reduction of dues, and
it [did] not provide a reasonably prompt decision
by an impartial decisionmaker." *Id.,* 89 L Ed 2d
249. The Court said:

> We reiterate that these characteristics are re-
> quired because the agency shop itself impinges on
> the nonunion employees' First Amendment inter-
> ests, and because the nonunion employee has the
> burden of objection. The appropriately justified
> advance reduction and the prompt, impartial deci-
> sionmaker are necessary to minimize both the
> impingement and the burden. [*Id.*]

The Court concluded that, even with the pro-
posed one hundred percent escrow, the union's
internal rebate procedure would continue "to pro-
vide less than the Constitution requires in this
context," and, therefore, affirmed the Court of
Appeals judgment of reversal. *Id.,* 89 L Ed 2d 249.

The propriety of Parks' discharge is not at issue
in the case at bar.[23] The meritoriousness of her
claim, that the First and Fourteenth Amendments
prohibited her employer from requiring her to

[22] The union had instituted the escrow procedure subsequent to the
district court's decision. The Court considered the procedure as it was
presented to the district court, stating: "It is clear that 'voluntary
cessation of allegedly illegal conduct does not moot a case.'" *Chicago
Teachers Union,* n 17 *supra,* 89 L Ed 2d 246, n 14 (citation omitted).
The union also advised the Court that it "would not object to the
entry of a judgment compelling it to maintain an escrow system in
the future." *Id.,* 89 L Ed 2d 248.

[23] Parks does not challenge the constitutionality of her discharge,
but only her disqualification from receiving unemployment benefits.
The merits of her dispute with the board are considered in this
opinion only to the extent that "[t]he circumstances under which one
leaves work must be carefully examined" in determining the applica-
bility of § 29(1)(a).

submit the agency fees in the manner in which those fees were demanded, must be considered, however, in determining whether her actions constituted "misconduct connected with [her] work" or a "voluntar[y] [leaving] without good cause attributable to the employer" within the meaning of § 29(1)(a) or (b). The circuit court, affirming the split decision of the MESC Board of Review,[24] expressly declined considering the "merits" of Parks' asserted justification for her actions.[25] I am persuaded that the circuit court erred in not considering the particular circumstances which led to Parks' discharge, and that the Court of Appeals memorandum affirmance was likewise erroneous in that regard. In reviewing the application of § 29(1)(a) or (b), the particular circumstances surrounding the claimant's discharge must be carefully considered. Under the circumstances, I am convinced that Parks' actions, after remand from the United States Supreme Court in *Abood,* were based upon a meritorious First Amendment claim against her employer. I would hold, therefore, that her actions did not constitute "misconduct" within the meaning of § 29(1)(b), and that her refusal to pay the service fees, which included an amount properly disputed, did not constitute a "voluntar[y]

[24] The MESC Board of Review affirmed the referee's decision by a vote of two to one. The dissenting member correctly considered the holding of the United States Supreme Court in *Abood* concerning the limited permissibility of the public sector agency shop, consistent with the First and Fourteenth Amendments, and the union's burden of proof to constitutionally justify the amount of the agency fees compelled from dissenting nonunion employees as a condition of public employment.

[25] The circuit court noted that the constitutionality of the public sector agency shop was "exhaustive[ly]" addressed by the United States Supreme Court in *Abood, supra.* The circuit court also noted that the propriety of Parks' discharge had been examined in "another action." The circuit court, therefore, found it unnecessary, in reviewing the application of § 29(1)(a), to consider, to any extent, the merits of Parks' asserted justification for her conduct. See *id.*

[leaving] without good cause attributable to the employer."

The analyses of my colleagues, like those of the Court of Appeals and circuit court, fail to adequately consider the particular circumstances which resulted in Parks' discharge. The assertion in Justice BRICKLEY's opinion that Parks "did not have a constitutional *right* not to pay the fees," is inaccurate, and does not support his analysis. The Supreme Court, in *Abood,* expressly held that Parks had presented a valid claim under the First and Fourteenth Amendments and that the burden of constitutionally justifying the amount of the agency shop fees rested with the union and the board. The *Abood* decision did not require Parks to pay the fees upon demand without any explanation whatsoever of the union's permissible expenditures, and to submit the entire amount of the disputed fees to the union in order to have standing to challenge the constitutionally permissible amount of the fees.

To characterize Parks' refusal to relinquish her First Amendment rights as wilful "misconduct connected with [her] work" is untenable; it was neither "misconduct" nor "connected" in any significant way with her work as a teacher and counselor.

With regard to Parks' disqualification under § 29(1)(a), the merits of her claim must be considered in determining whether she "left work voluntarily" and "without good cause attributable to the employer." Because Parks asserted a meritorious justification for not paying the agency fees in the amount and terms demanded, her unemployment did not result "voluntarily without good cause attributable to the employer."[26]

---

[26] See n 18.

Pursuant to the Supreme Court's decision in *Abood,* Parks reasonably believed, acting upon the advice of counsel, that her constitutional right to be free from coerced political and ideological conformity entitled her not to contribute the agency fee under the circumstances in which it was demanded. She did not refuse "to pay any fee whatsoever;" she refused to pay an amount equal to union dues directly to the union without an escrow arrangement, subject to an internal rebate procedure, without any advance reduction, explanation, or accounting, or an opportunity to challenge the amount of the fee before an impartial decisionmaker. I would conclude that the decision of the Court of Appeals affirming Parks' disqualification under § 29(1)(a) was clearly erroneous. The Court failed to consider the particular circumstances which led to Parks' discharge, including the asserted justification for her actions. Pursuant to my reading of *Abood, supra,* Parks' actions were in justifiable reliance upon her good-faith and meritorious belief that, consistent with the United States Constitution, she could not be compelled, under the particular circumstances, to submit to her employer's demand.

Finally, I would clarify that the constitutionality of Parks' discharge is not dispositive of the statutory issues presented in the case at bar. Whether Parks appealed her dismissal as a party-plaintiff in *Abood,* whether she chose to contest the propriety of her discharge before the Teacher Tenure Commission, and the outcome of any of the potential

Cf. *Nottelson v Wisconsin Dep't of Industry,* 94 Wis 2d 106; 287 NW2d 763 (1980). When an employee, in good faith, relies upon a meritorious legal justification for his noncompliance with a rule of employment, his actions are not necessarily inconsistent with the employer-employee relationship, and, therefore, his unemployment after being discharged, without regard to the propriety of the discharge, may not have been "voluntary" or "without good cause attributable to the employer" within the meaning of § 29(1)(a).

litigation concerning Parks' discharge which did, or could have, ensued, is, likewise, not dispositive. In reviewing the application of § 29(1)(a) or (b), the particular factual circumstances surrounding the claimant's discharge are controlling. My colleagues' analyses are flawed to the extent that they avoid evaluating the asserted justification for Parks' actions.

III

In *Wickey v Employment Security Comm,* 369 Mich 487; 120 NW2d 181 (1963), this Court strictly construed the predecessor of § 29(1)(a), and reaffirmed its earlier rejection of the doctrine of "constructive voluntary leaving." *Id.,* 497. We granted leave to appeal in each of the present cases to consider the application of § 29(1)(a) in cases in which the claimant was discharged—in each case the claimant's disqualification was upheld by the Court of Appeals on the basis of that provision.

I would acknowledge that § 29(1)(a) may be applicable, under some circumstances, in cases in which an employee is discharged; the applicability of § 29(1)(a) should not be limited to cases in which the employee says "I quit." When an employee voluntarily fails to comply with a condition of employment with knowledge that such failure requires resignation or will result in termination, and without good cause attributable to the employer, that disqualifying provision may, under the particular circumstances, be applicable. Issues concerning "volition" and "good cause" must be determined case by case. Whether an employee was formally discharged as opposed to voluntarily resigning should not, in all cases, be dispositive. When a claimant asserts a justifiable excuse for his actions, that justification must be carefully

considered. See, e.g., *Nottelson v Wisconsin Dep't of Industry,* 94 Wis 2d 106; 287 NW2d 763 (1980); *Barksdale v Director of Div of Employment Security,* 397 Mass 49; 489 NE2d 994 (1986). See, generally, Packard, *Unemployment without fault: Disqualifications for unemployment insurance benefits,* 17 Vill L R 635 (1972), and cases and commentary cited therein.

## IV

In summary, I concur in Justice BRICKLEY's decision for reversal in *Dolce.* While I disagree with Justice BRICKLEY's construction and application of § 29(1)(b) in *Lindquist,* I concur in the decision to affirm on the basis of the Court of Appeals application of § 29(1)(a).

In *Parks,* I would conclude that neither subsection (1)(a) or (b) is applicable, under the particular facts presented, and would, therefore, reverse the decision of the Court of Appeals. My disposition of *Parks* would make it unnecessary to address the independent constitutional question presented.[27]

[27] Parks challenges her disqualification under § 29(1)(a) as violative of the federal constitution on independent First Amendment grounds. Parks asserts that because "the agency shop itself is 'a significant impingement on First Amendment rights,'" *Chicago Teachers Union,* n 17 *supra,* 89 L Ed 2d 247-248, n 20 (quoting *Ellis,* n 16 *supra,* 455), her disqualification, assuming she voluntarily terminated her own employment without good cause attributable to her employer within the meaning of § 29(1)(a), would be unconstitutional as applied and, therefore, that an exemption would be constitutionally required. See Anno: *Discharge from employment on ground of political views or conduct as affecting right to unemployment compensation,* 29 ALR4th 287; Anno: *Leaving or refusing employment for religious reasons as barring unemployment compensation,* 12 ALR4th 611 (1982). Parks argues that the important governmental interest in labor stability, which justifies, to a limited extent, public sector union security agreements inasmuch as they narrowly serve that interest by preventing the "free rider" problem, does not justify the additional penalty resulting from the denial of unemployment benefits. She argues that no independent overriding governmental interest justifies compelling her to choose between her entitlement to unemployment compensation benefits and her First Amendment rights. Defendant-

LEVIN, J., concurred only in the result reached by RILEY, J.

BOYLE, J. (*concurring in part and dissenting in part*). I concur in Justice RILEY's finding that Lindquist was disqualified from the receipt of unemployment benefits under § 29(1)(a). I would find that Dr. Parks' refusal to pay union dues resulted in termination pursuant to the collective bargaining agreement. Because Mr. Dolce's retirement was for reasons beyond his control, I agree with Justice BRICKLEY's result.

I further agree with Justice RILEY that it is inappropriate in these cases to engage in a strained construction of the "work connected" requirement for disqualification on the basis of misconduct. Thus, I concur with Justice BRICKLEY's result in *Parks,* but not with his analysis in that case.

CAVANAGH, J. (*concurring in part and dissenting in part*).

### *LINDQUIST*

I concur with Justice RILEY's application of § 29(1)(a) of the Michigan Employment Security Act to plaintiff Lindquist's violation of the Saginaw City residency requirement.

### *PARKS*

I concur with Justice BRICKLEY's decision in

appellee board of education argues that "the only response which [this] Court needs to make to this argument is to rebuke Parks for asserting it," because "*Abood* had already decided the 'constitutional issue.'"

Because I would conclude that neither statutory disqualification is applicable in *Parks,* I would not reach this independent constitutional issue.

*Parks;* however, I would find that Parks, like Lindquist, was disqualified under § 29(1)(a) of the Michigan Employment Security Act. Parks' failure to pay agency fees constituted a voluntary leaving of her work.

It should be noted that the Supreme Court remand in *Abood v Detroit Bd of Ed,* 431 US 209; 97 S Ct 1782; 52 L Ed 2d 261 (1977), clearly encouraged Mrs. Parks to use the internal procedure established by the union for determining her pro-rata share of the agency fees.[1]

On remand to the circuit court, the trial judge ordered a stay in the proceedings to allow exhaus-

---

[1] In view of the newly adopted Union internal remedy, it may be appropriate under Michigan law, even if not strictly required by any doctrine of exhaustion of remedies, to defer further judicial proceedings pending the voluntary utilization by the parties of that internal remedy as a possible means of settling the dispute.[45]

---

[45] We express no view as to the constitutional sufficiency of the internal remedy described by the appellees. If the appellants initially resort to that remedy and ultimately conclude that it is constitutionally deficient in some respect, they would of course be entitled to judicial consideration of the adequacy of the remedy. [431 US 242.]

---

The voluntary procedure was described in *Abood, supra,* 240, n 41.

Under the procedure adopted by the Union, as explained in the appellees' brief, a dissenting employee may protest at the beginning of each school year the expenditure of any part of his agency-shop fee for " 'activities or causes of a political nature or involving controversial issues of public importance only incidentally related to wages, hours, and conditions of employment.' " The employee is then entitled to a pro rata refund of his service charge in accordance with the calculation of the portion of total Union expenses for the specified purposes. The calculation is made in the first instance by the Union, but is subject to review by an impartial board.

tion of the internal union remedies.[2] Apparently Mrs. Parks refused to participate in the union procedure, and the circuit court dismissed her case on that basis. She did not appeal the circuit court's dismissal of her case for lack of standing. The appeal of her firing under the teacher tenure act to the Court of Appeals did not raise the constitutional issue discussed in *Chicago Teachers Union v Hudson,* 475 US 292; 106 S Ct 1066; 89 L Ed 2d 232 (1986). Her motion for reconsideration was properly denied by the Court of Appeals as the constitutional issue had not been properly preserved.

### DOLCE

Plaintiff Dolce was required to retire pursuant to a collective bargaining agreement between the employees and the employer. The retirement age was sixty-five years unless the employee wished to work an additional three years. Dolce chose to work until age sixty-eight.

The lead opinion for reversal finds that Dolce is entitled to unemployment benefits as he did not voluntarily leave his work. It would hold that the collective bargaining process is too remote from the individual to allow any legislative presumption that an employee is bound by the agreement. In effect, an employee is considered not to have consented to the collective bargaining agreement.

The case on which the lead opinion relies, *Campbell Soup Co v Employment Security Bd of Review,* 13 NJ 431; 100 A2d 287 (1953), was rejected by the Court of Appeals in *Applegate v Palladium Publishing Co,* 95 Mich App 299; 290 NW2d 128 (1980), lv den 409 Mich 904 (1980). In *Applegate,* the Court of Appeals agreed with the Minnesota Supreme Court that, by being a member of the

---

[2] *Detroit Bd of Ed v Parks,* 98 Mich App 22, 46, n 24; 296 NW2d 815 (1980).

union, an employee has ratified or joined in union decisions and is bound by the decisions. *Bergseth v Zinsmaster Baking Co,* 252 Minn 63; 89 NW2d 172 (1958).[3] Thus, an employee like Dolce has given his consent, either express or implied, to the terms of the collective bargaining agreement including the retirement provisions.

The lead opinion looks to section two of the Michigan Employment Security Act to establish that unemployment benefits are to be used "for the benefit of persons unemployed through no fault of their own." No one has alleged any fault or misconduct on Dolce's part. Section two also provides that unemployment benefits serve as protection against the "crushing force" of unemployment and "th[e] hazard[s] of our economic life." The act was also designed to encourage employers to establish "stable employment." MCL 421.2; MSA 17.502.

The facts establish that Ford Motor Company provided Dolce with stable employment for over thirteen years. Dolce's retirement was not the result of a layoff or plant closing or any precipitous economic condition. A negotiated retirement is a contractual benefit to an employee designed to prevent unexpected economic loss. Indeed, the provision of the retirement plan in the present case allowing an employee three additional years of work seems most equitable.

Justice BRICKLEY upholds plaintiff Parks' disqualification from unemployment benefits on the basis that the union properly exercised its contract rights in requesting that the employer terminate Parks for her refusal to pay agency fees as the forced collection of these fees had been held consti-

---

[3] *MESC v Vulcan Forging Co,* 375 Mich 374; 134 NW2d 749 (1965), can be distinguished from the present case. It involved a forced, unpaid vacation for low seniority employees due to a plant shutdown.

tutional in *Abood, supra.*[4] If this same rationale is applied to Dolce, it is clear that the collective bargaining contract may be properly invoked to mandate retirement as bona fide retirement plans are a recognized exception to the constitutional prohibition against age discrimination. Michigan Civil Rights Act.[5]

I would find Dolce disqualified for unemployment benefits under § 29(1)(a) of the Michigan Employment Security Act.

---

[4] See discussion of *Parks.*

[5] MCL 37.2202; MSA 3.548(202):

(1) An employer shall not:

(a) Fail or refuse to hire, or recruit, or discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion, race, color, national origin, age, sex, height, weight, or marital status.

(b) Limit, segregate, or classify an employee or applicant for employment in a way which deprives or tends to deprive the employee or applicant of an employment opportunity, or otherwise adversely affects the status of an employee or applicant because of religion, race, color, national origin, age, sex, height, weight, or marital status.

(c) Segregate, classify, or otherwise discriminate against a person on the basis of sex with respect to a term, condition, or privilege of employment, including a benefit plan or system.

(2) This section shall not be construed to prohibit the establishment or implementation of a bona fide retirement policy or system which is not a subterfuge to evade the purposes of this section.

(3) This section shall not apply to the employment of an individual by his or her parent, spouse, or child.