[No. 12434-3-II. Division Two. August 27, 1990.]

PATRICIA FORSMAN, ET AL, *Appellants*, v. THE
EMPLOYMENT SECURITY DEPARTMENT,
*Respondent.*

*Martha L. Schmidt,* for appellants.

*Kenneth O. Eikenberry, Attorney General,* and *M. Geoffrey G. Jones, Assistant,* for respondent.

WIELAND, J.*—Patricia Forsman and Nina Morris appeal the trial court's affirmance of the decision by the delegate of the Commissioner of the Employment Security Department. The Commissioner's delegate denied benefits on the basis that the claimants had not established good cause for terminating employment. In reviewing that denial, we must answer four other questions: (1) Did the claimants have compelling reasons for terminating their employment? (2)

---

*Judge Herbert E. Wieland is serving as a judge pro tempore of the Court of Appeals pursuant to CAR 21(c).

Were they sufficiently certain of deterioration in working conditions before they terminated their employment? (3) Did they exhaust all reasonable alternatives before terminating their employment? (4) Was the deterioration in working conditions involuntary even though the union, of which the claimants were members, ratified the changes in working conditions? We answer these questions in the affirmative and find that the workers established good cause for terminating their employment. Thus, we reverse.

██ We review the record of the administrative tribunal, not the superior court. *Macey v. Department of Empl. Sec.*, 110 Wn.2d 308, 311, 752 P.2d 372 (1988). Neither party challenges the Commissioner's delegate's findings of fact, so those facts are verities on appeal. *Fuller v. Department of Empl. Sec.*, 52 Wn. App. 603, 606, 762 P.2d 367 (1988), *review denied*, 113 Wn.2d 1005 (1989). The findings of fact were entered by the administrative law judge and adopted by the Commissioner's delegate.

The findings for Morris read as follows:

1. The claimant is presently unemployed. She was employed by [Hancock Fabrics] in Tacoma as a sales clerk from August 25, 1969 until September 26, 1986. She worked varied hours and was paid $5.94 per hour as a member of United Food and Commericial [sic] Workers Union, Local 367 (Tacoma).

2. The claimant was hired by [Hancock Fabrics] to work on a full–time basis. Through the years hours fluctuated depending upon the business flow. The claimant worked 40 hours a week until 1980 when the hours were reduced. They were increased to 40 hours a week again in 1985. In April 1986 the claimant's hours were reduced to 22–24 hours per week. Contract negotiations began in April 1986 and the claimant remained on the job to determine what the final outcome would be. The claimant submitted her notice of intent to resign on September 19, 1986 approximately one week before the final contract vote was taken. Before submitting her resignation the claimant received reasonable assurance from the interested employer that their (sic) pay would be reduced from $5.94 per hour to $4.50 per hour and medical benefits would be lost plus several holidays and one weeks vacation. In addition, hours could not be guaranteed. Hours could possibly be increased in the future depending upon the business flow of the particular store. Since hours could not be guaranteed and the claimant was convinced

that her pay would, in fact, be reduced in addition to the loss of benefits, she terminated her position on September 26, 1986.

The findings of fact in Forsman's case were identical except that Forsman was employed from October 30, 1970, until September 26, 1986.

The contract negotiations mentioned are negotiations between the union and the employer. Both claimants voted against ratification, but the union members ratified the contract September 25, 1986.

The Employment Security Department (Department) denied benefits to both claimants on the ground that each had left work voluntarily without good cause. The claimants appealed, and the administrative law judge (ALJ) determined that the claimants' work conditions had deteriorated so that job separation was justified. On further appeal, the Commissioner's delegate reversed that decision, finding that the prospect of less favorable working conditions does not establish good cause, that the "employer would have attempted to provide additional hours if requested," that dissatisfaction with one's wage level does not constitute good cause for job separation, and that the deteriorations were voluntary because the union had ratified the contract. Therefore, the delegate determined that the claimants had not established good cause. The ALJ's order was set aside and the claimants were disqualified pursuant to RCW 50.20.050(1).[1] The trial court affirmed the decision in both cases.

An employee is disqualified from receiving benefits if she terminated employment voluntarily without good cause. RCW 50.20.050(1). To establish good cause the employee must satisfy three factors: (1) that she left because of work–connected factors; (2) that the factors were sufficiently compelling to cause a reasonably prudent person to terminate employment; and (3) that she exhausted all reasonable

---

[1]RCW 50.20.050(1) provides in pertinent part as follows: "An individual shall be disqualified from benefits beginning with the first day of the calendar week in which he or she has left work voluntarily without good cause . . .".

alternatives (but she need not perform futile acts). WAC 192–16–009.

# I
## DID THE CLAIMANTS HAVE GOOD CAUSE FOR TERMINATING THEIR EMPLOYMENT?

The Commissioner's delegate found that neither the wage reduction nor the prospect of less favorable working conditions was sufficient to establish good cause. He also found that "it would have been prudent" for the workers to wait until after the union ratification vote, and that the deterioration in working conditions was voluntary because the union ratified the new contract. We will consider each of these reasons in turn.

A. *Was the deterioration in working conditions sufficiently compelling to cause the claimants to terminate their employment?*

■ The Commissioner's delegate found that a wage reduction alone was not sufficiently compelling to cause the claimants to terminate their employment, and cited *Cowles Pub'g Co. v. Department of Empl. Sec.,* 15 Wn. App. 590, 550 P.2d 712 (1976), *review denied,* 88 Wn.2d 1001 (1977). We review the Commissioner's delegate's construction of the term "good cause" under the error of law standard. *Grier v. Department of Empl. Sec.,* 43 Wn. App. 92, 95, 715 P.2d 534, *review denied,* 106 Wn.2d 1003 (1986).

■ The reliance upon *Cowles* is misplaced, because that case did not involve a wage reduction. Instead, the employee quit because she was dissatisfied with her wages, which were significantly below the level of wages paid to other persons with similar seniority and skill. The *Cowles* court noted that wage reduction could constitute good cause, though that was not the case there. *Cowles,* 15 Wn. App. at 594. A substantial wage reduction has long been recognized as a compelling reason for terminating one's employment. *Grier,* 43 Wn. App. at 96. A reduction in benefits may also rise to the level of a compelling reason. *Matison v. Hutt,* 85 Wn.2d 836, 839, 539 P.2d 852 (1975).

The wage reduction of 24 percent, coupled with the reduction in hours per week of 45 percent, loss of medical benefits, holidays and 1 week's vacation, were sufficiently compelling to cause the claimants to terminate their employment.

B. *Must the employees wait until the actual deterioration in conditions?*

We review whether the claimant must wait until the change actually takes effect under the error of law standard.[2] *Grier,* 43 Wn. App. at 95. *See also Safeco Ins. Cos. v. Meyering,* 102 Wn.2d 385, 390, 687 P.2d 195 (1984).

The Department argues that by terminating employment before the actual deterioration, and before the contract ratification, the claimants failed to exhaust all reasonable alternatives. Of the cases cited by the Department, however, none presents a factual situation similar to the case before us.

In *Johns v. Department of Empl. Sec.,* 38 Wn. App. 566, 686 P.2d 517 (1984), the claimant was offered time to resolve conflicts with employers, but simply terminated his employment without pursuing a less drastic resolution. Similarly, the claimant in *Maltese v. Unemployment Comp. Bd. of Review,* 190 Pa. Super. 123, 152 A.2d 773 (1959) walked away from her job for personal reasons without first discussing possible resolution of her problems with her employer. Finally, in *Korte v. Department of Empl. Sec.,* 47 Wn. App. 296, 304, 734 P.2d 939 (1987), the claimant refused to sign a contract that was substantially similar to—if not better than—her agreement without the contract.

---

[2]The claimants argue that the standards of review set forth in RCW 34.05.570 apply. However, RCW 34.05.902 provides that RCW 34.05.001 through 34.05.902 took effect on July 1, 1989, and those sections apply to agency proceedings after that date. All proceedings begun before the effective date are to be completed as if the new sections had not been enacted and as if the old sections had not been repealed. This proceeding began in 1986.

The court reasoned that she should have signed the contract and waited to see if her working conditions actually worsened.

Here, the employer had already reduced the claimants' hours and the claimants were given no guarantee that the hours would be reinstated. The claimants were also given reasonable assurances that the wages and benefits would be cut. Thus, though the Commissioner's delegate labeled the wage and benefit losses as prospective, some of the losses had already occurred. The other losses were prospective only in the sense that they would occur in the future, but not in the sense that they were a mere possibility.

 When the reduction in benefits is imminent, the employee need not wait until the actual reduction. In *Grier* the claimant resigned 10 days before the actual reduction in benefits. The court reasoned that denying benefits because the employee resigned too early would be unreasonable where the benefit reductions were imminent. The court then found good cause, *Grier,* at 98, and held that the claimant was entitled to benefits commencing the day that the reduction in hours would have taken effect. *Grier,* 43 Wn. App. at 99. Thus, providing notice of intent to terminate before the actual deterioration in conditions is not fatal to claimants' cases.[3]

C. *Did the claimants exhaust all reasonable alternatives?*

 Whether the claimants exhausted all reasonable alternatives is a question of fact to be reviewed under the clearly erroneous standard. *Rodeen v. Department of Empl. Sec.,* 47 Wn. App. 60, 63, 733 P.2d 544 (1987) (citing *Johns,* 38 Wn. App. at 569, and former RCW 34.04.130(6)(e)) (A finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.). *Ancheta v. Daly,* 77 Wn.2d

---

[3]We need not address the question, which was addressed in *Grier,* of when benefits should begin, because the claimants here did not separate until after ratification of the contract, though they had given notice before ratification.

255, 260–61, 461 P.2d 531 (1969) (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 92 L. Ed. 2d 746, 68 S. Ct. 525, 542 (1948)). A finding, though denominated a conclusion of law, will be reviewed as a finding. *Prater v. Kent,* 40 Wn. App. 639, 644, 699 P.2d 1248 (1985).

In light of the findings of fact, the inferred finding that the claimants did not exhaust all reasonable alternatives is clearly erroneous. The Commissioner's delegate did find that the evidence was "persuasive that [the employer] would have attempted to provide claimant additional hours of employment had such been requested in lieu of her tender of her resignation." We do not believe that finding is clearly erroneous, since the employer's representative did testify to this. The finding does not, however, state that the hours would have returned to, or have even approached, 40 hours per week.

▇ What is more, even if the employer guaranteed 40 hours per week, the claimants still would have faced wage and benefit reductions. The claimants were powerless to change those reductions. If the union did not ratify the contract, the employer could have unilaterally imposed the wage and benefit reductions. The employee need not pursue futile possibilities. WAC 192–16–009(1)(c). Thus, the claimants' failure to pursue a futile course of action does not allow for a finding that they did not exhaust all reasonable alternatives before terminating employment.

D. *Was the deterioration in conditions involuntary?*

The Commissioner held that "[s]ince the new contract in the present case was freely negotiated, it cannot be said that the modification of claimant's working conditions was involuntary." The claimants argue that although the union is the exclusive bargaining agent, individual members are still entitled to unemployment benefits if they are adversely affected by the union contract.

The fault causing the unemployment may be attributed to the employer, the employee, or a third party. *Cowles,* 15 Wn. App. at 594–95. If the fault lies with the employee,

good cause cannot be shown and the employee is not eligible for benefits. *Cowles,* at 595.

There are two lines of reasoning concerning whether an agreement between the union and the employer will be considered the voluntary act of each union member. The first group of cases holds that by selecting the union as the bargaining agent, the employee has made the acts of the union his own. Thus, if the employee's unemployment or deterioration of benefits is contemplated by the contract, the employee is deemed to have voluntarily accepted the termination or deterioration. The other group of cases holds that the facts of each case must be examined and that the action of the union is not always to be attributed to the employee. 76 Am. Jur. 2d *Unemployment Compensation* § 65 (1975).

The cases cited by the Department support the position that the actions of the union may be attributed to the employee. In *In re Employees of Buffelen Lumber & Mfg. Co.,* 32 Wn.2d 205, 201 P.2d 194 (1948), employees were unemployed due to a short plant shutdown. Pursuant to the agreement negotiated between the union and the employer, certain employees were not paid during the idle period. The court held that the employees were voluntarily unemployed, reasoning that the employees accepted the benefits of union representation, and must also accept the burdens of that representation. *See also Efkamp v. Iowa Dep't of Job Serv.,* 383 N.W.2d 566, 569 (Iowa 1986); *Warblow v. Kroger Co.,* 156 Mich. App. 316, 401 N.W.2d 361 (1986).

However, there is support for the claimants' argument that the Legislature disapproved of the reasoning in *Buffelen.* After *Buffelen* was handed down, the Legislature added the following section to the statute:

[T]he cessation of operations by an employer for the purpose of granting vacations, whether by union contract or other reasons, shall in no manner be construed to be a voluntary quit nor a voluntary unemployment on the part of the employees.

Laws of 1951, ch. 265, § 12, now RCW 50.20.115.

Analyzing the voluntariness of a mandatory retirement at 65 provision in a collective bargaining agreement, one court reasoned as follows: "'If the inquiry is isolated to the time of termination, plainly none of the claimants left voluntarily in the sense that on his own he willed and intended at the time to leave his job." *Employment Sec. Comm'n v. Magma Copper Co.*, 90 Ariz. 104, 107, 366 P.2d 84, 86 (1961) (citing *Campbell Soup Co. v. Board of Review*, 13 N.J. 431, 100 A.2d 287 (1953)). *See also, e.g., Pacific Maritime Ass'n v. Unemployment Ins. Appeals Bd.*, 236 Cal. App. 2d 325, 45 Cal. Rptr. 892 (1965); *Warner Co. v. Unemployment Comp. Bd. of Review*, 396 Pa. 545, 153 A.2d 906 (1959).

Another court reasoned as follows:

> We recognize that under Michigan law the union is the collective bargaining agent for all the employees and in many respects the employee is bound by and accountable for the actions of its bargaining agent. However, for purposes of determining voluntariness under the [Michigan Employment Security Act], the collective bargaining process is too remote from the individual employees who come and go under it to allow those legislative presumptions under the state's scheme of labor law to transform a forced retirement into a voluntary leaving.

*Parks v. Employment Sec. Comm'n*, 427 Mich. 224, 245, 398 N.W.2d 275, 285 (1986). A commentator lauded similar reasoning in *Campbell Soup*:

> The voluntary action envisaged by the Act apparently relates to an individual's unilateral and contemporaneous act and cannot be meaningfully applied to situations where a body representing those of divergent views has previously negotiated a retirement date.

Recent Cases, *Unemployment Compensation—Compulsory Retirement Under Collective Bargaining Agreement Is Involuntary Leaving Which Does Not Disqualify Claim for Unemployment Compensation*, 67 Harv. L. Rev. 1437, 1438 (1954).

Washington has followed this reasoning in a slightly different context. *See Matison*, 85 Wn.2d at 838. In *Matison* the employees quit because the restaurant at which they

worked became nonunion. If they had continued employment the employees would have lost valuable union benefits. The court concluded that the claimants had good cause to terminate employment. *Cowles* examined *Matison* and noted that "[f]ault being with the union and external to the claimants, their voluntary unemployment was for good cause, entitling them to unemployment benefits . . .". *Cowles,* 15 Wn. App. at 595 n.9.

 The purpose behind the eligibility and disqualification provisions also supports this interpretation.

> The purpose of the eligibility and disqualification provisions of an unemployment compensation statute is to protect the state unemployment compensation fund against claims of individuals who would prefer benefits to jobs.

76 Am. Jur. 2d *Unemployment Compensation* § 32 (1975). Thus, the provisions focus on the individual situation of each worker at the time she decides to quit. The union focus is different: union bargaining aims to obtain the best contract for the most workers.

While the contract may be fair when considering the union membership as a whole, individual members may consider the new conditions intolerable. A detached observer might certainly conclude that the deterioration in conditions would have been a compelling reason for the employee to terminate her employment. The argument that the employee should be held to the actions of the union has no place in this equation.

It matters not to the employee who has seen her wages and benefits deteriorate if the union negotiated her contract or if the employer unilaterally imposed the reductions. It matters only that her compensation has deteriorated sufficiently to cause her to want to terminate her employment. If a detached observer would also conclude that the deterioration in conditions is sufficient to cause a reasonable person to terminate employment, it should not matter that the union agreed to the general contract.[4]

---

[4]*See* WAC 192–16–009(1)(b).

Union involvement should not matter because we are asking whether it was reasonable for the person to quit, or alternatively, whether this person would prefer benefits to a job. It is unreasonable to say that the employee, through her union, voluntarily accepted the reductions simply by belonging to the union. It is particularly unreasonable here, when the employees voted against the new contract, the employees quit because of the new contract, and the employees were given reasonable assurances by the employer that the cuts would occur with or without ratification of the new contract. Thus, in the context of what constitutes good cause, the union's ratification of a contract is not equivalent to the individual employee's voluntary assent to the contract.

Focusing on the claimants here, they did not voluntarily accept the wage, hour, or benefit cuts. The cuts were part of the union agreement. Thus, the Commissioner incorrectly concluded that the modification of working conditions was voluntary.

E. *Conclusion.*

We conclude that the claimants established good cause for terminating their employment. Thus, we reverse.

## II
### ATTORNEY'S FEES

Attorney's fees should be awarded when the court overturns or modifies the Commissioner's ruling. RCW 50.32-.160; *Abulhosn v. Department of Empl. Sec.*, 106 Wn.2d 486, 492, 722 P.2d 1306 (1986). We award attorney's fees of $3,000 to Forsman and $3,000 to Morris.

ALEXANDER, C.J., concurs.

WORSWICK, J. (dissenting)—I disagree with the majority for two reasons. First, the majority resolves questions of fact already resolved, differently, by the Commissioner. We cannot do this, but must defer to administrative findings. *See Franklin Cy. Sheriff's Office v. Sellers*, 97 Wn.2d 317,

325, 646 P.2d 113 (1982) (substitution of appellate court's judgment for that of the administrative agency in factual matters is not authorized by the APA), *cert. denied,* 459 U.S. 1106 (1983).

Here, the Commissioner's delegate specifically found persuasive evidence[5] that, had Forsman and Morris so requested, their employer would have increased their hours. The majority says that the finding does not state that the hours would have "returned to, or have even approached 40 hours per week." The issue, however, is whether the claimants had exhausted reasonable alternatives to quitting. By failing to request additional hours, they did not exhaust these alternatives, and we will never know how many additional hours the employer would have allowed. The finding that persuasive evidence showed a request for more hours would have been granted is tantamount to a finding that such a request would not have been futile. The majority's different interpretation amounts to impermissible fact finding.

Second, the claimants' terminations plainly were voluntary. While there may be two lines of cases on the subject of whether an agreement between a union and an employer binds each union member, Washington is firmly aligned with those cases holding that the union is the members' agent in employment matters. *In re Employees of Buffelen Lumber & Mfg. Co.,* 32 Wn.2d 205, 201 P.2d 194 (1948). *Buffelen* held that, under the terms of a union negotiated vacation agreement, claimants were voluntarily unemployed during a plant–wide vacation closure. As the concurring Justice pointed out:

---

[5]Part of the Commissioner's conclusion of law 4 states: "We find the evidence persuasive that petitioner [Hancock Fabrics] would have attempted to provide claimant additional hours of employment had such been requested in lieu of her tender of her resignation." This finding, although denominated a conclusion of law, is reviewed as a finding of fact. *Western Ag Land Partners v. Department of Rev.,* 43 Wn. App. 167, 172, 716 P.2d 310 (1986).

> The union spoke for the employees; it was their voice. In reality, the employees themselves, speaking through the union, made the agreement.

*Buffelen*, 32 Wn.2d at 211 (Schwellenbach, J., concurring). The Legislature's enactment of a later statute providing that unemployment during required vacations is not voluntary speaks to that issue alone; it cannot be construed as legislative disapproval of the overriding principle that a union is the voice of its members in employment matters.

As the majority points out, union bargaining is aimed at obtaining the best contract for the most workers. The union protects the employee from dismissal for lack of work. Annot., *Termination of Employment as a Result of Union Action or Pursuant to Union Contract as "Voluntary" for Purposes of Unemployment Compensation Benefits*, 90 A.L.R.2d 835, 846 (1963) (considering general rule that employee who quits in refusing lower paying job when there is no longer work in his regular classification is voluntarily unemployed). It cannot be said that an employee who, despite this union protection, elects to take a chance on finding a better position elsewhere is without fault in the termination of the employment.

The union's negotiating role here also undercuts the majority's holding that the reduction in pay and benefits constituted "good cause" for quitting. The majority cites two cases for this proposition. *Grier v. Department of Empl. Sec.*, 43 Wn. App. 92, 715 P.2d 534, *review denied*, 106 Wn.2d 1003 (1986), and *Cowles Pub'g Co. v. Department of Empl. Sec.*, 15 Wn. App. 590, 550 P.2d 712 (1976), *review denied*, 88 Wn.2d 1001 (1977). In neither *Grier* nor *Cowles*, however, was there a union negotiating on behalf of the employees. As the majority points out, fault for unemployment will generally lie with the employer, with a third party, or with the employee. *Cowles*, 43 Wn. App. at 593.[6]

---

[6]The *Cowles* court found the claimant's reasons for voluntarily quitting, "low wages and lack of promotional opportunity", to be "nothing more than personal dissatisfaction" so that the facts presented an instance of "employee fault". The court noted, "Human ambition for greater material wealth has produced both

In *Grier,* the employer reduced the employee's hours and benefits, and the court found that Grier had good cause to quit. Here, however, the employer *negotiated* with the claimants' representative; there was no unilateral imposition of reductions. There can be no fault on the part of an employer who negotiates with the employee's representative as required by labor law. Further, as the *Cowles* court noted, "[U]nemployment arising from personal dissatisfaction with low wages . . . is voluntary idleness". *Cowles,* 15 Wn. App. at 596.

Forsman and Morris were union members. Speaking for them, the union negotiated a contract; the union membership ratified the contract. That contract was binding on all members, including those like Forsman and Morris who had not voted for it. To allow members who are dissatisfied with the contract to walk away from it, unemployment benefits intact, undercuts the force of union membership, violates the purpose of the Employment Security Act (to assist those unemployed "through no fault of their own"), and goes against the settled law of this state. Therefore, I dissent.

Review denied at 116 Wn.2d 1005 (1991).

---

industry and misery, but seems a characteristic inherent in us all. If fault must be levied, it lies with the claimant and her own internal humanity." *Cowles,* 15 Wn. App. at 595.